THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LAVADA WOOLLUMS, Defendant-Appellant.

Fourth District    No. 15853

Opinion filed January 29, 1981.

Daniel D. Yuhas, of State Appellate Defender's Office, of Springfield, and Steven L. Murray, law student, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield (Melbourne A. Noel and Michael Vujovich, Assistant Attorneys General, of counsel), for the People.

Mr. JUSTICE MILLS delivered the opinion of the court:

Murder.

Jury trial.

Guilty.

Sentence of 25 to 75 years.

We affirm.

The body of Terry Lee Kline was found off Cooperstown Road in Brown County on March 6, 1975. The victim was lying face down next to a fence. His trousers were down below his knees and the pockets were turned inside out.

Joanne Burgess Giamometti testified that she saw the defendant, Lavada Leon Woollums, kill the victim. On March 1, 1975, she was working as a prostitute for defendant. At 3 a.m. on that date, the defendant, Kline (the victim), Teresà Woollums (defendant's ex-wife), and Joanne Giamometti left Peoria to go to Quincy. Defendant and Kline were drinking. They took Route 24 out of Peoria. Defendant told Joanne and Teresa to go through Kline's pockets, whereupon Kline took his money out and put it on the dashboard. His pockets were pulled out. Defendant then shot Kline in the head, turned off the highway onto a gravel road, stopped, and then dragged Kline's body out of the car into a ditch. Defendant, Teresa and Joanne continued on to Quincy, where defendant changed his clothes at Johnny "Red" Barrigar's room at the St. Jude Hotel. Joanne and Teresa went to a car wash but could not get the blood out of the car. Defendant left the gun at Red's and then defendant, Teresa, and Joanne went to Springfield. They left Springfield for Mason City (where defendant, Teresa, and Joanne were living), and on the way defendant passed out. The next day, defendant told his brother that he had killed Kline. Joanne testified that defendant was very drunk and that every time she saw him on the night in question, he was drinking.

John Barrigar (known as "Johnny Red") testified that on the morning of March 1, 1975, he gave defendant a pair of pants, and defendant offered to sell him a gun.

State Police Officer James Felts pulled defendant's car over on March 6, 1975, shortly after Kline's body was found. Defendant was driving a white-over-reddish-brown Cadillac. Felts observed defendant reach over the seat and the car went up in flames.

Teresa Scorsilini (previously known as Teresa Woollums) testified that she had been married to defendant and also worked as a prostitute for him. On March 1, 1975, Teresa, defendant, Kline, and Joanne Giamometti left Peoria for Quincy. Defendant pulled a gun on Kline and Teresa

told him to put it down to allow a car to pass. Defendant told Teresa and Joanne to search Kline's pockets. Defendant then shot Kline three times. The shooting occurred on Route 24, five to 10 minutes out of Rushville. Defendant was driving 60 to 80 m.p.h. Defendant then turned onto a dirt road and dumped Kline's body. When they arrived at Johnny Red's, Teresa and Joanne washed the blood off defendant's hands and took the car to a car wash. When they got back, defendant had on different clothes. They then left for Springfield and on the way defendant passed out. Later, at a bar, defendant and his brother, Terry, made plans to burn the car. Teresa explained that she did not report the murder because she was afraid of defendant, who used to beat her.

In June 1978, Teresa gave police officers written permission to record her telephone conversations. An eavesdropping order was obtained in Winnebago County, where Teresa was living. An edited version of a conversation between defendant and Teresa, recorded June 18, 1978, was played to the jury. Defendant called Teresa from Pontiac, where he was incarcerated and serving time for an unrelated conviction. He told her, in effect, not to talk to police about this incident and that if she had any questions to call his lawyers. When Teresa expressed the opinion that the police knew he killed Kline, defendant agreed but stated that they could not prove it because they have to have an eyewitness and they do not have the gun.

During deliberations, the jury requested the tape recording of defendant's conversation with Teresa. Over defense objection, the court allowed the jury to hear the recorded conversation once again in the courtroom.

### Rights to Counsel and Privacy

Defendant strenuously argues his right to counsel was violated when the State was allowed to use his incriminating statements made during his conversation with Teresa. He stresses that he made the statements when Teresa was working with the police, a fact of which he was clearly unaware. Defendant was incarcerated at the time the statements were made and, although he had not been indicted for this offense, he had secured the assistance of counsel. Defendant claims the State intentionally created a situation whereby he made incriminating statements without the assistance of counsel, and the recording, therefore, should not have been admitted.

Defendant cites *Massiah v. United States* (1964), 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199, and *United States v. Henry* (1980), ___ U.S. ___, 65 L. Ed. 2d 115, 100 S. Ct. 2183, as support for this contention. *Massiah* held that a defendant was denied his sixth amendment right to counsel when there was used against him at his trial evidence of his own

incriminating words, which Federal agents had deliberately elicited from him after indictment and in the absence of counsel. The *Henry* court found incriminating statements made by an accused to an undisclosed government informant after indictment to have been "deliberately elicited" within the meaning of *Massiah* and obtained in violation of his right to counsel. It is defendant's argument that even though he was not indicted at the time the statements were made, the fact that he had secured counsel at the time shows that the statements were obtained in violation of the sixth amendment.

■■ We hold there was no violation of defendant's right to counsel. The clear rule of *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him. (*Brewer v. Williams* (1977), 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232.) It is when formal charges are placed against an accused that the right to counsel accrues. (*Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877.) We disagree with the premise that by securing counsel before indictment, an individual can dictate when his own right to counsel accrues. The fact that no proceedings or charges concerning this murder had been initiated against defendant when his statement to Teresa was made defeats his claim that his right to counsel was violated. No right to counsel had attached, and the rules of *Massiah* and *Henry* are inapplicable.

■■ Furthermore, defendant's reliance on the fact that he was incarcerated on another offense when this incriminating statement was made does not aid his claim. This court fully recognizes the right to counsel during preindictment custodial interrogation, even where, as here, the custody involved a different charge from that under which the suspect is being held. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *Mathis v. United States* (1968), 391 U.S. 1, 20 L. Ed. 2d 381, 88 S. Ct. 1503.) But, the right to counsel during custodial interrogation implements the *fifth* amendment right against self-incrimination and does *not* proceed from the *sixth* amendment. (*Jett v. Castaneda* (9th Cir. 1978), 578 F.2d 842.) The fact that there was no interrogation of defendant precludes any contention that this statement was obtained in violation of a right to counsel under the fifth amendment.

■■ Defendant also challenges the admission of his statement on fourth amendment grounds, arguing his reasonable expectations of privacy have been violated. Defendant finds support for his privacy claim in the administrative regulations of the Illinois Department of Corrections, which put residents on notice that mail will be opened but not that telephone calls may be monitored. This argument ignores the fact that defendant's call was not monitored by prison officials but was recorded by a device placed on the phone in Teresa's home. The scope of one's right to privacy while incarcerated is not in question.

Teresa consented to the recording of her conversation with defendant and a court order, authorizing the eavesdrop, was secured. There is no fourth amendment violation in eavesdropping on a conversation with the permission of one of the parties. *United States v. White* (1971), 401 U.S. 745, 28 L. Ed. 2d 453, 91 S. Ct. 1122; *People v. Richardson* (1975), 60 Ill. 2d 189, 328 N.E.2d 260.

Further support for our conclusion that the admission of the tape recording was proper is found in *United States v. Craig* (7th Cir. 1977), 573 F.2d 455, *cert. denied* (1978), 439 U.S. 820, 58 L. Ed. 2d 110, 99 S. Ct. 83. There, defendant Walker challenged the admission of three recorded conversations had with a co-conspirator, Carpentier. At least one of the calls was initiated by Carpentier, who had permitted postal inspectors to record his conversations. The court found no interest protectable by the fourth amendment in situations in which one party to a conversation reposes trust in the other party who is actually an undisclosed informant. The conversations between Walker and Carpentier involved no confrontation with governmental authority in the context of a custodial interrogation, so there was no violation of Walker's fifth amendment rights. Walker's sixth amendment right to counsel argument was rejected for the reason that there had not yet been a "criminal prosecution" when his conversations were recorded. No right to counsel had attached even though the governmental authorities were aware Walker had retained counsel before the recordings were made.

Defendant also argues the introduction of his statement was improper because it informed the jury that he had exercised his sixth amendment rights by retaining counsel. Defendant informed Teresa that if she had any questions she should contact his lawyers. We find the case relied upon, *People v. Kennedy* (1975), 33 Ill. App. 3d 857, 338 N.E.2d 414, distinguishable. Kennedy's conviction was reversed because the jury was advised that after he was arrested he demanded counsel and attention was directed to this evidence during closing argument. This court found such testimony constitutionally impermissible upon the necessity to protect fifth amendment rights. We have already ruled that defendant had no right to counsel under the sixth amendment when this statement was made and that the statement was not obtained in violation of the fourth or fifth amendment. We hold that defendant's reference to counsel during his statement to Teresa does not constitute an impermissible comment on the exercise of his constitutional rights.

### VENUE

Defendant also claims his conviction must be reversed because the State failed to establish that the offense occurred in Brown County beyond a reasonable doubt. The jury was properly instructed that if it concluded beyond a reasonable doubt that the death of Kline occurred in

Brown County, it could consider the question of defendant's guilt; and, if it concluded Kline's death did not occur in Brown County, it should find defendant not guilty. (See *People v. McClain* (1978), 60 Ill. App. 3d 320, 376 N.E.2d 774.) We conclude, however, that there is sufficient evidence to support the jury's determination beyond a reasonable doubt that the murder did occur in Brown County. There was considerable testimony about the Cooperstown Road being the first Brown County road off Route 24 and that was where the Brown County authorities investigated Kline's death after his body was discovered there. We will not disturb the jury's finding.

## INTOXICATION

Defendant next argues he was not proved guilty beyond a reasonable doubt because the State failed to rebut his affirmative defense of intoxication. Defendant raised the defense of voluntary intoxication and testified that beginning in 1975 he drank heavily every day. When he was drinking, he would not be able to remember events unless someone told him about them. Defendant thinks he went to Peoria on February 28, 1975, and thinks he drank beer, schnapps, and wine before leaving. Defendant only remembers waking up sick and with a hangover on March 2, 1975.

Mary Ferrando, an expert on alcoholism, defined alcoholic blackout as a term used to describe a period of amnesia, induced by heavy alcohol consumption. It is a feature of alcoholism and can last anywhere from several minutes to three days or more. There is no way to tell if a person is in a blackout state because the person is able to function. In her opinion, the possibility of defendant having experienced alcoholic blackout was very high.

In rebuttal, Dr. Richard Herndon expressed the opinion that alcoholic blackout would not apply to these facts because it usually lasts for a matter of hours, not days. Further, the actions of defendant required that he remember what he did first to do what he did next. We agree with the State that ample evidence was presented—including defendant's own testimony—to rebut defendant's claim of alcoholic blackout and to establish his mental state for the crime of murder.

## MISCELLANY

The remaining issues raised by defendant are similarly without merit:

■■ a. Defendant contends the prosecutor improperly cross-examined him concerning his knowledge of "pimps." Even assuming the prosecutor exceeded the bounds of proper cross-examination, this evidence was not so prejudicial as to require a new trial.

■■ b. Defendant complains that the prosecutor deliberately elicited

information that he used to beat Teresa, which is evidence of unrelated misconduct. This statement was offered by Teresa in explanation of her failure to report this murder. It was properly admitted.

c. It is within the trial court's discretion to determine whether a jury's request to review testimony be allowed. (*People v. Pierce* (1974), 56 Ill. 2d 361, 308 N.E.2d 577.) We find no abuse in allowing the jury's request to hear the recording of defendant's conversation with Teresa during deliberations.

d. Defendant's claim of error in the trial court's failure to instruct the jury on the State's burden of disproving his defense of voluntary intoxication is waived by his failure to tender the proper instruction, Illinois Pattern Jury Instructions, Criminal, No. 25.02 (1968), and his failure to preserve the issue in his motion for a new trial. *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331; *People v. Sprinkle* (1979), 74 Ill. App. 3d 456, 393 N.E.2d 94.

e. Defendant asserts the evidence of intoxication justified his tendered involuntary manslaughter instruction and that the trial court erred in refusing it. While we agree that the defense of voluntary intoxication may reduce the degree of homicide from murder to voluntary manslaughter so that a voluntary manslaughter instruction must be given to the jury if requested, voluntary intoxication will not reduce the degree of homicide another degree to involuntary manslaughter. (See *People v. Zynda* (1977), 53 Ill. App. 3d 794, 368 N.E.2d 1079.) Furthermore, we have reviewed the record and find no evidence that defendant acted recklessly toward the victim that would justify an involuntary manslaughter instruction independent of the intoxication defense. The refusal to instruct on involuntary manslaughter was not error.

Both conviction and sentence of Woollums are affirmed.

Affirmed.

TRAPP, P. J., and GREEN, J., concur.