DOWNEY, Judge.
On June 22, 1978, the Grand Jury of Broward County indicted Richard DeAngelo for: (1) murder in the first degree by pro *574 curing Leonard Leon to commit a robbery against Narbly Keshishian, during the course of which robbery, or attempted robbery, Leonard Leon shot and killed Neil Prince with a .38 caliber pistol, and (2) robbery by procuring Leonard Leon to commit a robbery against Narbly Keshishian, during the course of which DeAngelo carried a .30 caliber rifle.
A petit jury found DeAngelo guilty of both first degree murder and robbery while being armed with a firearm. The court entered judgments of guilty pursuant to the verdicts and imposed a life sentence as punishment for each conviction, the sentences to run concurrently. DeAngelo raises three issues on appeal from those judgments and sentences; two of these issues warrant discussion.
Regarded in the light most favorable to the verdicts, the evidence showed the following events.
By prearrangement Narbey Keshishian and Neil Prince agreed to meet Leonard Leon at a specified location to effect the purchase of a large amount of marijuana. Upon Keshishian and Prince’s arrival at the location Leonard Leon took them to a large warehouse complex. Upon entering a particular warehouse, they met DeAngelo. Keshishian asked DeAngelo: “Where’s the pot?”, whereupon DeAngelo asked: “Where’s the money?” Keshishian left the warehouse, obtained $28,000 and returned. When he reentered the warehouse Leon pulled an automatic pistol and'' DeAngelo drew a revolver and a rifle and ordered Leon to search Prince and Keshishian. Shortly thereafter shots were fired and Keshishian ran from the warehouse to Oakland Park Boulevard where he was picked up by Pannuccio, a partner with Keshishian and Prince in the proposed purchase. Kesh-ishian told Pannuccio they had been ripped off and eventually Pannuccio notified the police that Prince was missing. As a result of the shooting Leonard Leon and Prince died; DeAngelo was wounded and ended up in Broward General Hospital.
Gary Leon visited DeAngelo in the hospital to find out what happened to his brother Leonard. The police learned Gary planned to visit DeAngelo and they asked him to carry a body bug and tape any conversation with DeAngelo. At one of Gary’s two hospital visits DeAngelo told Gary that he (DeAngelo) and Leonard were going to shake down Keshishian and Prince, i. e., take their money and keep the drugs. He also told him about the shooting.
At trial DeAngelo objected to the admission of either the tapes of his conversations with Gary Leon or to any testimony by Leon regarding their conversations. Thus, the first question we deal with involves the trial court’s acceptance into evidence of Gary Leon’s testimony concerning incriminating statements DeAngelo had made to Gary Leon during the course of the hospital visits, at a time when DeAngelo was not in custody.
DeAngelo argues, in sum, that the trial court’s reception of Gary Leon’s testimony violated his rights under the Fifth and Sixth Amendments, contending he was in custody and was interrogated by Gary Leon (who was an agent of the State) withqut first being advised of his rights as set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Since Gary Leon testified that DeAngelo told him, “They [DeAngelo and Leonard Leon] were going to shake these people [Prince and Keshishian] down for money and keep the drugs,” it is clear that Gary Leon’s testimony was extremely helpful to the State and extremely damaging to DeAngelo. It may be that the foregoing testimony is, as the State suggests, cumulative to the testimony Keshishian gave, and therefore any error in its admission is harmless. We do not pass on the foregoing contention of the State because we do not think the trial court erred in allowing Gary Leon to give testimony concerning conversations he and DeAngelo had during Leon’s two visits to DeAngelo’s hospital room.
Shortly before Gary Leon testified, the defense and the prosecution had a lengthy three-way discourse with the court concerning (a) the propriety of Leon’s being permitted to testify concerning his conversation with DeAngelo during visits to DeAn-gelo’s hospital room on May 1st and May 3rd and (b) whether tapes made during *575 Gary Leon’s two visits to DeAngelo were admissible. That discourse included some proffers, legal speculations, and legal argument. The prosecution conceded that, while Gary Leon made both visits to DeAn-gelo in order to find out for himself what had led to the death of his brother Leonard, he made the visits with the additional purpose of gaining information from DeAngelo to help the police in their investigation of the events at the warehouse. The prosecution also conceded it thought “on May. 1st DeAngelo was a primary suspect,” but did not describe the nature of the offense of which DeAngelo was a primary suspect. In turn, the defense conceded that at neither visit of Gary Leon to DeAngelo was there a custodial interrogation. Thereafter, the defense conceded Gary Leon would say, if asked, that he visited DeAngelo to find out what happened to his brother and the police said, “Well, if you are going in there, do you mind us wiring you up?” At the close of the discourse, the court ruled that no tape was admissible, but that Gary Leon’s testimony was admissible under Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).
In order to answer the question whether the admission of Gary Leon’s testimony into evidence violated DeAngelo’s Fifth Amendment privilege against self incrimination or his Sixth Amendment right to counsel (the bifurcated first issue deserving discussion) we must resolve a preliminary question as to the Sixth Amendment: did DeAngelo have the right to be represented by counsel when Gary Leon visited him in the hospital on May 1st and 3rd?
Normally an individual’s Sixth Amendment right to counsel arises only after an accusatory pleading is filed against the individual. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); Malone v. State, 390 So.2d 338 (Fla.1980); Barfield v. State, 402 So.2d 377 (Fla.1981); People v. Woollums, 93 Ill.App.3d 144, 48 Ill.Dec. 452, 416 N.E.2d 725 (1981). However, an individual against whom no accusatory pleading has been filed becomes an accused, in effect (and therefore entitled to representation by counsel), when a general investigation into an unsolved crime ceases and the investigation focuses on that individual. Escobedo v. Illinois, 378 U.S. 478, 485, 84 S.Ct. 1758, 1762, 12 L.Ed.2d 977, 982 (1964).
More specifically, the Escobedo court held:
“that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied ‘the Assistance of Counsel’ . . . and that no statement elicited by the police during the interrogation may be used against him at a criminal trial.” 378 U.S. at 490-491, 84 S.Ct. at 1765, 12 L.Ed.2d at 986,
and ended its decision by stating:
“We hold only that when the process shifts from the investigatory to accusatory — when its focus is on the accused and its purpose is to elicit a confession our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer.”
378 U.S. at 492, 84 S.Ct. at 1766, 12 L.Ed.2d at 987.
In the present case neither side presented evidence that the general investigatory process had ended. Moreover, it is clear that DeAngelo was not in custody when Gary Leon visited him in the hospital, and the police did not, through Gary Leon, conduct any interrogation designed to elicit a confession from DeAngelo. Gary Leon, while stating (a) that the police knew he was visiting DeAngelo and that they told him “to keep a running conversation to gather information” and (b) that he told the police what he saw and heard during the second visit, consistently maintained his *576 purpose in visiting DeAngelo was to find out for himself the circumstances of his brother’s death. Under these circumstances the investigation was still general and had not focused on DeAngelo; thus DeAngelo did not have a right, under Escobedo, to consult with counsel before talking with Gary Leon. Our conclusion is bolstered by the following factors.
First, after the Supreme Court of the United States announced its Escobedo decision, the Supreme Court of Florida was presented with the question of whether a confession obtained by the police pursuant to a custodial interrogation following an arrest but preceding an indictment for first degree murder and appointment of counsel was admissible against the defendant at trial. The court held that (a) the confession was admissible because it was voluntary, and (b) the police did not violate the defendant’s right to counsel in obtaining the confession before counsel had been appointed, since the right to counsel did not attach because,
“Before a suspect has been formally charged with a crime — while the investigative processes are still going on — there is no ‘criminal prosecution’ [within the meaning of the Sixth Amendment] to which [the] constitutional guaranty [of the right to counsel] can attach.” Montgomery v. State, 176 So.2d 331, 334 (Fla.1965).
The Court distinguished Escobedo on the ground that its holding was restricted to its facts, and the facts in Montgomery were different from those of Escobedo, in that Montgomery made no request for the presence of counsel before the custodial interrogation while Escobedo had asked for counsel before his custodial interrogation and the police had denied his request. Accord: Myrick v. State, 177 So.2d 845 (Fla. 1st DCA 1965); Dampier v. State, 180 So.2d 183 (Fla. 1st DCA 1965). A plurality of the Supreme Court in Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), recognized that an individual’s Sixth Amendment right to counsel does not attach until adversary judicial proceedings are brought against him, limiting the holding of Escobedo to its own facts and stating “that the ‘prime purpose’ of Escobedo was not to vindicate the constitutional right to counsel as such, but, like Miranda, ‘to guarantee full effectuation of the privilege against self-incrimination. . . ’.” 406 U.S. at 689, 92 S.Ct. at 1882, 32 L.Ed.2d at 417. Based on the foregoing authorities and on People v. Woollums, 93 Ill.App.2d 144, 48 Ill.Dec. 452, 416 N.E.2d 725 (1981) (which relied on Kirby v. Illinios), we hold that DeAngelo’s right to counsel did not attach until he was indicted for murder and robbery, and therefore DeAngelo had no Sixth Amendment right to counsel at the time of Gary Leon’s visits to him at the hospital. Since DeAngelo had no Sixth Amendment right to counsel during the visits, the admission into evidence of Gary Leon’s testimony concerning statements DeAngelo made during those visits could not infringe upon DeAngelo’s constitutional right to counsel.
Second, United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), upon which DeAngelo primarily relies, does not support his position that the admission of Gary Leon’s testimony into evidence infringed his Sixth Amendment right to counsel. It seems to us that the Supreme Court reversed Henry’s robbery conviction because the government, by paying (on a contingency basis) Henry’s cellmate to insinuate himself into Henry’s confidence and deliberately engage Henry in conversation to secure incriminating information, “intentionally creat[ed] a situation likely to induce Henry to make incriminating statements without the assistance of counsel, [and thereby] . . . violated Henry’s Sixth Amendment right to counsel.” 447 U.S. at 275, 100 S.Ct. at 2189, 65 L.Ed.2d at 125.
None of the foregoing circumstances is present in the case before us. The record shows the police did not intentionally create a situation likely to induce DeAngelo to make incriminating statements; DeAnge-lo’s presence in the hospital was fortuitous; DeAngelo was not in custody; Gary Leon’s visits were voluntary; DeAngelo knew Gary Leon; and Gary Leon did not deliberately engage DeAngelo in conversation to secure incriminating information. The record shows no infringement of DeAngelo’s right to counsel.
*577 The second part of the first issue is whether the admission of Gary Leon’s testimony infringed DeAngelo’s privilege against self-incrimination. We hold that no Fifth Amendment violation occurred during the Gary Leon — -DeAngelo conversations because when Leon visited and spoke with DeAngelo no one exercised any coercion over DeAngelo, and DeAngelo’s statements were purely voluntary. Since there was no compulsion, DeAngelo’s Fifth Amendment privilege against self-incrimination was not violated. Odom v. State, 403 So.2d 936 (Fla.1980). We conclude that the trial court acted properly in admitting Gary Leon’s testimony concerning incriminating statements DeAngelo voluntarily made to Leon.
The other quéstions deserving discussion is whether the robbery conviction and the life sentence imposed therefor were proper.
As indicated above, the first degree murder charge was based solely on the felony-murder rule. The indictment contains no language that would support a premeditated murder charge. Therefore, the State could prove first degree murder only by showing that the homicide of Prince took place during the perpetration or attempted perpetration of a robbery.
Florida law relative to convictions and sentences for felonies underlying first degree murder convictions under the felony-murder rule has been in a state of flux for quite some time. The latest pronouncement of our Supreme Court on the subject is that when the sole basis for a first degree murder conviction is an unpremeditated homicide committed during the commission of a specified class of felonies, the defendant may be sentenced for the murder; in addition he may be convicted of the underlying felony, but the trial court may impose no penalty pursuant to the conviction for the underlying felony. State v. Hegstrom, 401 So.2d 1343 (Fla.1981). Accordingly, we affirm the judgment of guilty of robbery but quash the life sentence imposed pursuant to the robbery conviction.
For the forgoing reasons we affirm the judgment of guilty of first degree murder, the life sentence entered thereon, and the judgment of guilty of robbery. However, we quash the sentence entered upon the robbery conviction and we remand the cause with directions that the trial court vacate the life sentence for the robbery conviction.
AFFIRMED IN PART; REVERSED IN PART; and remanded with directions.
LETTS, C. J., and ANSTEAD, J., concur.